All right, it looks like we have all the parties present. If the clerk could please call the case. 3-24-05-76 Thomas Grossi Appellant v. Adventist Glenoaks Hospital Appellee and Dr. Nicholas F. Katena Appellee. Mr. Gianaris, if you're ready, you may proceed. Yes, sir. Thank you. May it please the court, I'm Ted Gianaris on behalf of the and the appellant Thomas Grossi and we're here to ask the court to reverse the trial court's grant of summary judgment. It's our position the trial court erred in requiring Mr. Grossi to have a retained expert present opinion that Mr. Grossi's brain bleed would have been detectable when he was in the emergency room treated by Dr. Katena and at the defendant's hospital. Going back in time, on August the 3rd, 2017, which was a Thursday, Mr. Grossi was involved in a crash. Mr. Grossi hit his head. He went home, slept, and Friday morning, woke up Saturday morning, went to the emergency room. At the emergency room, he complained of a headache, a chest injury, and just basic results of a crash. There is a factual dispute whether he told the hospital, the ER, the nurses he had hit his head or not. Mr. Grossi testifies he did tell them that. His wife testifies he told them. There's no record in the hospital records, no note in the hospital records that he did. So either he didn't do it or it wasn't written down if he told them. Mr. Grossi, Dr. Katena focused on his chest and worked up for a chest injury, did a neurologic evaluation, but did not do a CT scan of his head. He was released, and two months later, he had what we call a catastrophic brain bleed. Below, the trial judge wrote in his order granting summary judgment that there was, for the purpose of summary judgment, there was evidence that Mr. Grossi had a brain bleed at the time he was at the hospital on August the 5th. So I'll read that to you. In the light most favorable, plaintiff can, underlined, establish that the hematoma could date back to August. There's also testimony in the case from a treating radiologist who saw Mr. Grossi, who read his films in October, that the most likely source of the hematoma, the larger hematoma that caused the catastrophic result in October, dated back to August the 5th. So, counsel, if I can ask, given the amount of time between when the plaintiff presented in the hospital and the time in October where the CT scan is finally done, I mean, obviously this is a situation where the hematoma is developing over time and getting worse, obviously. I mean, why isn't it a reasonable concern from a proximate cause standpoint that could this, would this thing even have been observable at the time he presented to the hospital in August? Yes, sir. I think it is a reasonable concern. I just don't think that we need expert testimony on that issue in this particular case, considering all the facts that we have evidence that he had a brain bleed on August the 5th. We have evidence that the brain bleed grew over time. We have evidence that from a radiologist, treating radiologist, saying that the brain bleed existed on August the 5th. Could have existed, counsel. Sir? Could have existed. Could have existed, but for the... Not that it existed, but could have existed. Could have existed, yes, sir. But from a summary judgment standpoint, a jury can draw a reasonable inference that it did exist at the time. So, you're talking about Dr. Reynolds' testimony? No, let me just check. Dr... No, Dr. St. Martin. Okay, but Dr. Reynolds, I think... Didn't he say that these things could sometimes get bigger, sometimes get smaller, sometimes they go away? He did. He said, yes. Yeah, exactly. Yes, sir. And I think, obviously, it didn't get smaller or go away. It did get bigger over time. So, it's our position that summary judgment is improper because we have evidence that there was a subdural... Some evidence, it's not conclusive, but there was a subdural hematoma on August the 5th, 2017, that a CT scan was not performed. Obviously, that's inconclusive, or that's conclusive, that the brain bleed grew over time and that it became catastrophic in October. Can I ask a different question? Let's assume, for the sake of argument, that a CT scan had been performed back in August and a very nominal, small... It's not medical diagnostic standpoint or a care standpoint between that and when he is feeling bad enough that he goes back to the hospital in October. From a standard of care standpoint, what is it you think would have changed to prevent what occurred in October from happening? So, let me just find it here. So, doctor, my retained expert testified earlier detection... And this is... I'm not quoting, but this is from my papers. Earlier detection supports the position that would have allowed earlier intervention before the bleed became catastrophic. Dr. Reynolds, who is the... neurosurgeon said, if he had a small subdural and he was monitored in my clinic, we probably would have followed it. And if it had gotten bigger or caused symptoms, we would have discussed a procedure to either immobilize it or remove it surgically. So, before it became catastrophic, it would have been treated. And one of the ways it would have been treated would be, and he explained it in his deposition, like putting a stent in the heart. So, rather than to do an open craniotomy, removing part of the skull, a stent could have been put in. So, I think it stands to reason that if it's detected and therefore Mr. Grossi has followed, before anything catastrophic happens, the pressure could have been relieved as soon as he started showing some neurologic symptoms. So, there's testimony that there would have been a different result if the brain bleed would have been detected earlier. So, it's certainly not our position that we don't have to show that there would have been a different result. It's simply our position that on the facts of this case, we don't have to have retained expert opinions on each of these issues in order to defeat summary judgment. Counsel, weren't you given an opportunity to disclose a rebuttal witness on this particular topic? Yes, sir. And you declined? Yes, sir. It was my position that we had sufficient evidence through our retained expert and through the treating physicians. Thank you. You're welcome. So, we just asked that the court look at the case from the standpoint of what evidence was before the trial judge at the time of the grant of summary judgment. Understanding that jurors can draw reasonable inferences from these facts and find that summary judgment was improper in this case. Thank you. Any questions, Justice Hedl or Justice Anderson? I have a couple factual that way. If counsel needs some time to grab them out of the record, he will be able to. Didn't your clients go to the same ER twice in August? Yes. I believe a week later. But your complaint centers around the first visit, correct? As it stands now. The original complaint focused on both visits and we dismissed the second ER doctor. Okay. So, our operative complaint or the one that we would be looking at is just the original, the first date in the ER, the 9th, I believe, or 12th. Let's say August 5th. 5th, excuse me. 5th, 2017. Thank you. And then one other question, counsel, before we turn it over to the defense. Did you include your retained experts entire deposition in the record or is it there? I couldn't find it. No, sir. I did not. Okay. Thank you. You're welcome. All right. Mr. Sam, you may proceed. Good morning. May it please the court, your honors, counsel, Anthony Sam on behalf of Apelli Adventist Glen Oaks Hospital. This court should affirm the trial court's decision for three reasons. One, under Illinois Supreme Court rule 341, the plaintiff's brief is deficient. Then second, that there are fatal gaps in the evidence as to whether a CT scan would have shown a brain bleed on August 5th, 2017. And the third issue, which my colleague will argue, is that there's a fatal gap in the evidence as to what if any treatment would have been done had a brain bleed been diagnosed. As an initial matter, the plaintiff's brief is deficient under Illinois Supreme Court rule 341 as the plaintiff has failed to first provide sufficient factual basis for this appeal. Plaintiff fails to cite to the record and has failed to provide a complete record on appeal as Justice Heddle pointed out by his failure to include the exhibits that were attached to our motion for summary judgment and a complete copy of the plaintiff's experts' discovery deposition. In Fouch v. O'Brien 99 Ill 2D 389, the Supreme Court indicates that all deficiencies in the record on appeal should be construed against the appellant. If we can get past those deficiencies, I want to focus on the main argument as to the fatal gap in the evidence. The trial court was correct. This was not a decision that was made haphazardly or that caught the plaintiff unawares. As the record indicates, we disclosed on behalf of the hospital both a neuroradiologist and an emergency room doctor who both testified that this patient did not have a diagnosable brain bleed on August 5th of 2017. And if you look at the report of proceedings, particularly pages six and seven, when this matter was argued before the court at judgment, I pointed out to the court that this was an issue that had come up in discovery and that the plaintiff had been given the opportunity to disclose a rebuttal expert, particularly at the common law record at C-977, C-991, and C-999. Between September 13th, 2023, and December 12th, 2023, the plaintiff represented a need to disclose rebuttal experts to deal with this issue. And so, it was no surprise that our motion for summary judgment targets the fatal gaps in the evidence. Particularly, the plaintiff disclosed an emergency room physician, Dr. Craig Fury, to testify regarding the standard of care that applied to Dr. Katania in the emergency room. And solely for the sake of our motion for summary judgment, we don't talk about standard of care. We focus particularly on causation because the plaintiff's theory in this case is that a CT scan should have been ordered on August 5th of 2017. The problem with that is that the plaintiff doesn't have any testimony at all as to what a CT scan would have shown or might have shown. Indeed, we cite in the record that at the plaintiff's expert's deposition, common law record page 1008 and 1009, that the question was put directly to Dr. Fury. And in your opinion, if a CT was ordered and taken of his brain on August 5th, 2017, would you agree that it would be speculation on your part to give an opinion on what it would show? Answer, I would agree with that. Now, the plaintiff focuses in on Dr. St. Martin's testimony. He was a radiologist at Adventist Glen Oaks Hospital. And he focuses in on one part of Dr. St. Martin's testimony as to whether or not this brain bleed could date back to August 7th of 2017. But that's not the issue. It doesn't matter whether the brain bleed could date back to August 5th of 2017. In fact, the accepted that as an actual fact that the brain bleed could date back to that date. The problem is that the plaintiff needed evidence that it was diagnosable. And that's particularly true because of the way brain bleeds are depicted. We had testimony from both Dr. St. Martin and Dr. Reynolds, both neurosurgeon and a radiologist. Both of those individuals said sometimes you can catch them and sometimes you can't. There is no testimony in this particular case that had a CT been performed that it would have. No one offered an opinion to a reasonable degree of medical certainty, more likely true than not, that had a CT scan been done on August 7th of 2017, it would have been diagnostic of a brain bleed. Because that testimony doesn't appear in the plaintiff can't move forward in this case. The panel should know that we didn't just file a motion for summary judgment under section 1005. We also cited Celotex versus Cartet. It is the put up or shut up motion for summary judgment where a defendant only needs to come forth with evidence that shows that the plaintiff can't meet a prima facie case for a case to go forward to the jury. Thereafter the burden is on the plaintiff to come forth with the factual evidence, citations to the records, citations to the deposition testimony that shows that this case should go to the jury. I would point out that this is the same question that Judge Schwartz asked of the plaintiff at the hearing, particularly at the report of proceeding page 10. He says, where in the record does it tell me that this brain bleed was diagnosable back in August? And part B of the equation is what would the treatment have been had it been diagnosed? The plaintiff argued that they were entitled to some inference at the summary judgment stage. But that's not the fact. They were not entitled to an inference. They were required to come forth with evidence establishing the factual basis for their claim. And they failed to do so after having an opportunity to disclose a rebuttal expert, to discuss this issue which came up in the discovery depositions of the treaters, and they simply failed to do so. Now there are a number of cases that we cite. Each one supports the proposition that summary judgment in this case was appropriate. But I want to focus on one, Weidenbeck versus Surly. In that case, the plaintiff went to the emergency department with a headache and Dr. Surly didn't order a CT. She came back to the next day with a worsening headache and now a new doctor ordered a CT which showed that she had a cyst in the third ventricle which was causing problems. She was ultimately transferred to the University of Chicago where she had a brain herniation and she died four years later as a complication of the sequela from her injury. In that case, the trial court granted summary judgment for Dr. Surly where the patient failed to show an earlier CT caused an injury or failure to order an earlier CT caused the plaintiff an injury or lessened the effectiveness of the treatment. In this case, the plaintiff suffers from those same fatal gaps. There is no evidence, at least the plaintiff has not pointed to any evidence that someone has testified that had a CT scan been done on August 5th of 2017, it more likely than not would have shown a brain bleed. That failure is fatal on the issue of proximate cause and for those reasons and the reasons stated in our brief, this court should affirm the decision made by the trial court granting summary judgment in favor of the defendant. Justice Heddle or Anderson, any questions? No, I don't. All right, Mr. Sam, thank you. Mr. Craig. Thank you, Your Honor. May it please the court, Patrick Craig on behalf of Dr. Katana, circuit court's order granting the defendant summary judgment should be affirmed. In addition to lacking expert testimony on the issue of whether a subdural hematoma would have been diagnosed on August 5th, 2017, there's a second individually sufficient reason to affirm your question earlier to Grossi's counsel about what difference would a diagnosis have made. And Grossi failed to offer expert testimony establishing to a reasonable degree of medical certainty how Grossi's treatment would have differed or how his outcome would have been improved if a hematoma were diagnosed that date at Glen Oaks Hospital. Mr. Craig, why is St. Martin's testimony deficient? Sure, Dr. St. Martin's testimony with respect to the fact that in his opinion that the car accident was likely the preceding event which caused the hematoma? No, that if they would have saw the hematoma, they would have monitored the hematoma. It seems like from a lay perspective, it seems like something that common sense would tell us that that's what we would do. Sure. So the treating neurosurgeon, Dr. Reynolds from Loyola, he testified that if he were alerted to the presence of the hematoma on August 5th, 2017, what his office would have done was to monitor the patient. And his testimony clarifies that surgical intervention would have only been considered if the brain bleed became large enough such that it was causing symptoms on the patient. And Dr. Reynolds also testified that brain bleeds grow at unpredictable rates. They can get bigger, they can grow smaller, they can dissipate on their own and not show up on imaging. And so there's no testimony stated to a reasonable degree of medical certainty that following this patient, whatever that means that Dr. Reynolds in his office, there's no testimony as to what that means in terms of how often the monitoring would have been done. Would the brain bleed have grown at a consistent rate such that earlier monitoring or any intervention before the date the craniotomy occurred on October 7th would have resulted in any surgical intervention, let alone the surgical intervention that Grossi claims he should have which he says the embolization is what he desired, a less invasive procedure if the hematoma were caught earlier. And Dr. Reynolds also testified that there isn't much difference between the different surgical options. There may have been a little less invasive for an embolization, but there's equal risk in them because you're still performing an open procedure on a subdural hematoma. I apologize for mixing, excuse me, if you'll let me finish, Justice Brennan. My but I mean Reynolds does talk about a different way to do this and he does talk about, so isn't really the quality or the strength of his testimony we're talking about as opposed to no testimony? I think that the fact that the testimony states that his office would have only considered surgical intervention if the brain bleed was growing large enough such that it was causing symptoms on the patient is the key here because there's no expert testimony that can provide a linear progression of this hematoma growing to a point that at a certain date it would have caused symptoms such that early intervention would have been required. The standard here, which is key in this case, is that for proximate cause in a medical negligence case, plaintiff needs to put on expert testimony stated to a reasonable degree of medical certainty. And the testimony here from all the experts is uncertainty about how subdural hematomas can develop. And there's no medical testimony stated to a reasonable degree of medical certainty as to what would have happened if they were followed. So there could have been a different procedure, but even if a different procedure would have resulted from more consistent monitoring because the hematoma was diagnosed earlier, Dr. Reynolds also testified that there isn't much difference between the procedures and that they all present a relatively equal amount of risk in the procedure that is ultimately undergone for the patient. So he didn't say anything about when the procedure would take place, other than symptoms. Correct. There's no testimony to the reasonable degree standard of medical certainty. Monitoring this patient could have equally resulted in no surgical intervention occurring until the date of the procedure. There's no verifying medical evidence or reasonable certainty that would allow a jury to find that earlier monitoring would have resulted in a different outcome. And you cannot allow a jury in a complex medical case to speculate on an issue such as that. And again, this goes to my colleague's point about how there's no retained expert testimony on radiology or neurosurgery to clarify for a jury how earlier monitoring or how this subdural hematoma could have progressed to result in a more positive outcome or what grossly describes as a more desirable surgical outcome. Is there anything anywhere in any of the experts' testimony talking about the possibility of follow-up CT scans absent Mr. Grossi saying he's experiencing new symptoms? From the medical expert testimony in the record, I do not believe there is any testimony about more frequent CT follow-ups being scheduled as a result of what occurred on the occurrence at Glenn Oaks Hospital on August 5, 2017. The patient was instructed to follow up with his own PCP for further instructions in accordance with what Dr. Kitana had discussed with the patient on August 5, 2017. And he does receive subsequent care at Glenn Oaks and at Loyola, but there's nothing with respect to this subdural hematoma, which is why the fact that there's no expert testimony with what a CT scan would have shown on the date is so crucial here. But I guess my question was poorly phrased. If a CT scan had been done back in August, no one has testified that if a hematoma had been discovered at that time, a small hematoma, that we would have had a follow-up procedure that would have routinely done more CT scans just to ensure that there wasn't any increase in the size of the hematoma or problems, absent Mr. Grossi reporting new symptoms. Did anyone testify to that? Yes, I understand your question. There's no testimony about what anything would have occurred, better surgical treatment, more frequent scans or imaging done. There's no testimony about what would have occurred if a subdural hematoma was diagnosed on that occurrence date. So on the that is why there is no evidence that would allow this matter to go to a jury. With my remaining time, I'll just clarify that Dr. Oksana, we agree that Wiedenbeck is a very strong case in support of affirming summary judgment here. And our brief points out how the evidence here is even more insufficient than compared to the plaintiff in Wiedenbeck. Unless there are no other questions, we ask this court to affirm summary judgment in favor of the defendants. Justice Hedl or Justice Anderson? No. All right, thank you. Mr. Gianaris, you get the last word. Okay, thank you, Your Honor. Mr. Gianaris, before you start, let me just, I'm just trying to wrap my arms around what moves this from speculative to genuine question of material facts? I mean, can you point to something specific for me? So I think what moves it from speculative to a genuine issue of material fact is the jury's ability to draw inferences. I'm talking about evidence. Yeah, I understand, Your Honor. And so the jury is charged with drawing inferences from facts, of course. And the evidence is that Mr. Grossi had a brain bleed on August 5th, 2017, when he appeared in the ER, that the brain bleed grew over time, and that by two months later, the brain bleed became catastrophic. So there is solid factual evidence on those three points that take the fact, or I'm sorry, the allegation that of the violation of standard of care on August 5th, 2017, in the ER from speculation to a reasonable inference that a jury can draw in this case. Therefore, it should not have been disposed of on summary judgment. I think those three facts, that there was a brain bleed on August 5th, 2017, and maybe it's more than three, I apologize, that a CT scan was not done, which is, according to our expert witness, a violation of the standard of care, that Dr. Reynolds, the neurosurgeon, testified that if he knew about a brain bleed, he would have watched, he would have waited, he would have monitored. And if there were any signs, he would have performed a procedure. And the fact that, as we know, none of that happened, and Mr. Grossi ended up with a catastrophic brain bleed in October of 2017. So those are the facts, your honor. That's what I have. And I'll just point out that the case, if I heard widened back, the difference in time was a day between the two CT scans, I think is what was represented to the court. And that was a totally different proximate cause analysis than this situation. So the difference when a CT scan does not see a injury, a CT scan is not done on day one, and then a CT scan is done on day two, and there is an injury shown, proximate cause, that'd be hard to argue that the intervening day, the gap, was the proximate cause of the end result, I think, four years later. And we point that out in our response to our final brief in this case. So we say that what the Weidenbeck court held, we find no expert evidence was offered to reasonable degree of medical certainty that Dr. Cyril's alleged deviation caused Weidenbeck's injuries or lessen the effectiveness of her treatment. Whereas we do have testimony from our retained expert that earlier intervention would be a better result, and from the treating neurologist who said he would have monitored, and if he saw neurologic signs, he would have embolized or put in a stint or perhaps implemented burr holes, which is different than what happened to Mr. Grossi. So, I'll rest on that. Justice Hedl or Justice Anderson? No questions. Thank you, Mr. Gianaris. The court thanks all three counsel for your spirited arguments. We are going to take the matter under advisement, render a decision in due course, and the court is going to be adjourned until the next argument. Thank you. Thank you very much. Thank you, counsel. Thank you.